UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MEGHAN NICOLE QUINN | * |
| | * |
| Plaintiffs | * |
| v. | * |
| | * |
| U.S. PRISONER TRANSPORT INC., | * |
| PRISONER TRANSPORT SYSTEMS | * |
| OF AMERICA, LLC, | * |
| ANDROSCOGGIN COUNTY, | * |
| JOHN DOE ONE, | * |
| JOHN DOE TWO and | * |
| ANDREW ROBINSON | * |
| | * |
| Defendants | * |

**COMPLAINT – JURY TRIAL DEMANDED**

NOW COMES Plaintiff Meghan Quinn and complains against the Defendants as follows:

INTRODUCTION

1. In November 2016, two men, operating under the authority of Androscoggin County, shackled Meghan Quinn ("Meghan") in a dog cage affixed to the floor of a fifteen-passenger van. For five days, the van sped along a round-about route from Florida to Maine—zigzagging up the eastern seaboard. During the roughly 120-hour trip, the men only released Meghan from her cage three times to use the bathroom, standup, sit down, or walk around. For the remainder of the journey, she knelt in the dog cage covered in her own blood, urine, and fecal matter, as the van's drivers refused to provide for her most basic human needs. Megan arrived in Auburn, Maine, traumatized, with a broken nose, infections where the men overtightened her shackles, and covered in her own bodily fluids.

2. This civil action seeks relief from Defendants' tortious conduct and violations of Meghan's civil rights.

1

## PARTIES

3. Plaintiff Meghan Quinn resides in Sabattus, Maine.

4. Defendant U.S. Prisoner Transport, Inc. is Florida corporation with a principal place of business in Melbourne, Florida.

5. Defendant Prison Transport Systems of America, LLC ("PTS of America") is a Tennessee limited liability company with a principal place of business in Whites Creek, Tennessee. U.S. Prisoner Transport merged with PTS of America in 2015.[1]

6. Defendants John Doe One and John Doe Two are yet-to-be identified employees of the Transport Defendants.

7. Defendant Androscoggin County is a municipality located in Maine.

8. Defendant Andrew Robinson is the former Androscoggin County District Attorney.[2]

## JURISDICTION

9. This Court has subject matter jurisdiction over the federal law claims alleged pursuant to 28 U.S.C. § 1331 because those claims arise under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4) because this action seeks to redress the deprivation, under color of state law, of Plaintiff's civil rights. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

10. Venue is appropriate in United States District Court, District of Maine because a substantial part of Defendants' alleged wrongdoing occurred here.

---

[1] Defendant U.S. Prisoner Transport and Defendant Prison Transport Systems of America are collectively referred to as the "Transport Defendants."

[2] Defendant Androscoggin County and Defendant Robinson are collectively referred to as the County Defendants.

GENERAL ALLEGATIONS

11. In November 2016, law enforcement in Osceola County, Florida arrested Plaintiff Meghan Quinn on a warrant issued by Androscoggin County District Attorney Andrew Robinson.

12. The Osceola County Florida Sheriff's Department detained Meghan for sixteen days pending extradition to Maine.

13. In late November 2016, on the Sunday before Thanksgiving, the John Doe Defendants arrived in a modified fifteen-passenger van to take custody of Meghan and transport her back to Auburn, Maine.

14. Upon taking custody of Meghan, they forced her into a metal compartment the size of a dog cage. She could not stand up, lie down, or even sit upright. Kneeling was the most comfortable position. She was the only woman in the transport van. There were no seat belts.

15. Meghan's cage was affixed near the front of the van. Separating her from the male passengers were two small windows. She could hear and see them, and they her.

16. Over the course of five days, the van traveled approximately 1,500 miles from Kissimmee, Florida to Auburn, Maine.

17. When the van left Florida, Meghan was wearing leggings and a tank top. As they traveled north in November, however, temperatures dropped. The van's prisoner compartment lacked heat and insulation. Megan's entirely-metal cage became brutally cold during the first night. She could see her breath and the cold metal, surrounding her on all sides, froze her skin upon contact. The guards rejected her plea for anything to stay warm. She became hypothermic and began violently shaking.

18. By the second day, the van had yet to stop for a bathroom break. For hours, Megan pleaded with the guards to pull over so that she could relieve herself. First, they told her to wait just a couple of hours. After two or three hours had come and gone, however, Megan finally informed the guards that she could not wait any longer. At that point, one of the guards handed her a Ziploc bag. When Megan asked what the bag was for he replied, "you got to pee, right?"

19. Confined in a dog cage, with a heavy chain belted around her waist, handcuffs on wrists, and overtightened shackles on her legs, Megan attempted to use the Ziploc bag as a toilet. As she pulled down her pants, the male passengers—who could see her entire body—looked on, jeered, and berated her with sexual threats as she urinated in a plastic bag.

20. Because the van only stopped about once a day—with three or four stops during the entire trip—for bathroom breaks, Megan endured this ritual every day of the trip. When the guards ran out of Ziploc bags, she used a bottle.

21. At one point, she was forced to defecate in a McDonald's cheeseburger wrapper. The wrapper and its contents sat in the cage with her for a day. The smell was so horrendous that she vomited almost constantly.

22. As they approached New England, Meghan experienced bleeding associated with her menstrual cycle. Shackled in her cage, Meghan's clothing became completely bloodied. Humiliated, vomiting, and crying hysterically, Megan begged the drivers to help her. The van's drivers became annoyed and slammed on the brakes while traveling at highway speeds. Unbelted, and without the use of her hands, she flew forward and smashed into the front of her cage—shattering her nose.

23. The impact that broke her nose also flipped her upside down in her cage where she remained—her legs in the air and her broken nose jammed into the metal van floor. Only when the van stopped three hours later did the guards return her to an upright position.

24. In New York, the drivers stopped to sleep in a hotel. The prisoners stayed in a county jail holding cell. Still unable to change, Megan spent the night as she spent most of the trip—covered in her blood, vomit, and urine.

25. The next day, she refused to get back in the van without a change of clothes. The drivers threatened to tase and mace her.

26. Approaching Maine, the guards become concerned that Meghan's appearance would cause problems when they arrived. In another New England state, the guards purchased a new pair of pants and stopped at a secure facility so that she could change.

27. When a police officer tried to remove Meghan's blood, vomit, and urine-caked pants, however, she had to cut them off because they had adhered to her skin.

28. On the fifth day, Meghan arrived in Auburn, Maine, with a broken nose, and drenched in her bodily fluids.

29. She needed serious medical attention. Over the journey, her ankle shackles—that the guards severely overtightened in Florida—had chaffed through her skin to the bone. The bodily fluids that she bathed in for the entire trip leaked into these wounds, and by the time she reached by Maine, infection set it.

30. Androscoggin County ignored her repeated requests for treatment of her broken nose. It did not heal properly. Now, over a year later, her treatment requires re-breaking her facial bones to ensure a full recovery.

31. Meghan's ongoing emotional pain overwhelms her physical pain, however. Diagnosed with post-traumatic stress disorder, depression, and anxiety, she cannot go an hour without being haunted by the trauma she experienced speeding down the highway in the hands of two untrained drivers as she—unbelted, frozen, covered in her blood, and kneeling in a dog cage for five days—prayed for a fiery crash to free her from Defendants' torture.

## COUNT I

## Civil Rights Violation – 42 U.S.C. § 1983

32. Plaintiff repeats and realleges every other paragraph in this Complaint.

33. At all relevant times, the Transport Defendants, through their agents and employees, were transporting prisoners across state lines, an exclusively-governmental function, and acting under the color of law.

34. Without their contract with Androscoggin County that authorized them to transport Meghan to Maine and that delegated the County's governmental authority, the Transport Defendants would never have exercised custody over Meghan.

35. At all relevant times, Megan was a probationer or pretrial detainee protected from cruel and unusual punishment, use of excessive force, or punishment without the due process of law.

36. For a course of five days, the John Does deprived her of adequate food, water, and medical care. At the beginning of the trip, they forced her into a steel cage barely large enough for a dog. For then on, they subjected Megan to freezing temperatures for days on end, made her urinate in Ziploc bags, defecate in a McDonald's cheeseburger wrapper, wear clothes covered in her blood, and broke her nose.

37. Sitting only a couple of feet away, the John Does were acutely aware of Meghan's condition. They heard her plead for help; beg for a blanket, a bathroom break, and clothes not covered in blood. In response, the John Does tossed her a Ziploc bag—and, having heard enough, intentionally jammed on the van's brakes, causing Megan to slam into the side of her metal cage and shatter her nose.

38. The John Doe Defendants severely overtightened Meghan's ankle bracelets so that they cut down through the skin to her bone, causing infection and permanent scaring.

39. As the largest prison transport company in the United States, the Transport Defendants treat countless prisoners like they did Meghan. The Transport Defendants routinely create inhumane conditions for their prison transportees because they provide only inadequate training and because their policy encourages the mistreatment of prisoners.

40. Driven by profits—and to meet deadlines—the Transport Defendants require that their drivers travel extremely long distances at high speeds without stopping. Further, they only contract with a handful of jails along a given transport route to house transportees overnight or provide bathroom stops. As a result, traveling for entire days without stopping is a standard operating protocol for the Transport Defendants' drivers.

41. To facilitate these minimal-stop transports, Transport Defendants' policy requires their drivers to carry Ziploc bags that they force prisoners to use instead of an actual bathroom facility. Once full, the Ziploc bags remain on the floor of a van until the drivers stop for gas. At that point, they don gloves and simply jettison the human-waste-filled Ziploc bags into a gas-station or roadside trash can.

42. Upon information and belief, the Transport Defendants encourage drivers to push harder without stopping, drive through the night and divert from their scheduled routes to pick up new passengers—all to increase their profits.

43. The lack of food, water, medical care, and failure to accommodate for basic human needs—like the shortage of stops—is similarly driven by the Transport Defendants' policies. To save money, the Transport Defendants allow their drivers only a six-dollar-per-day food and beverage budget for each transportee. As a result, each transported prisoner receives, for the day, a couple of items off the McDonald's dollar menu.

44. When Meghan pleaded for a blanket, the drivers told her that the Transport Defendants had a policy of not providing any—even in the winter traveling up the east coast in an unheated van. Similarly, when she begged for a new pair of pants after blood, vomit, and urine made wearing her's unbearable, a driver relented and called the Transport Defendants for authority to purchase a cheap set of pants. He was told, however, that his "boss would not authorize such a purchase"—despite the obvious medical need.

45. The Transport Defendants' lack of training and profit-driven policies cause widespread constitutional violations. Since 2006, numerous prisoners have died in the Transport Defendants' custody because of similar conduct by their employees and agents. At least thirty other prisoners have filed suit against the Transportation Defendants alleging similarly-inhumane conditions. A few examples of these cases are:

   a. *Richardson v. PTS of America et al.* 2015 U.S. Dist. LEXIS 169528 (M.D. Pa. Oct. 27, 2015) (denying in part defendants' motion to dismiss). In 2013, Darren Richardson was extradited from Florida to Pennsylvania by Defendant PTS of America because he failed to pay a $250 probation-completion fee. During the extradition, PTS of America agents allegedly demanded Richardson's watch in exchange for a pleasant journey; deprived him of regular food, water, and bathroom stops; and urinated on him.

8

b. *Robinson v. PTS of America et al.*, 2006 U.S. Dist. LEXIS 26482 (M.D. Tenn. Apr. 24, 2006) (denying in part defendants' motion to dismiss). Plaintiffs V.L. Robinson alleged sexual assaulted by the Transport Defendants' employee while in their custody.

c. *Karn v. PTS of America et al.*, 2017 U.S. Dist. LEXIS 151889 (D. Md. Sept. 18, 2017) (denying in part defendants' motion to dismiss). Plaintiffs alleged a ten-day trip from Maryland to South Carolina under conditions similar to those suffered by Meghan.

46. It is the County Defendants' interstate prisoner transport policy to transport extradited detainees to Androscoggin County using the Transport Defendants' services and not Androscoggin County personnel. Androscoggin County contracted with the Transport Defendants for these services.

47. Before hiring the Transport Defendants to extradite Meghan from Florida to Maine, Androscoggin County knew, or should have know, that the Transport Defendants conduct their operation by abusing the transported prisoners and violate their constitutional rights.

48. If Androscoggin County had conducted even minimal due diligence, it would have alerted to the Transport Defendants' horrific prior conduct. A simple google search, for example, reveals media reports regarding prisoners' deaths and alleged sexual assaults in Transport Defendants' custody; a report by the Marshall Project documents egregious constitutional violations; and an investigation by former Attorney General Loretta Lynch.

49. Upon information and belief, other Maine counties refuse to use PTS of America or U.S. Prisoner Transport because of their well-known reputation for moving prisoners in torturous conditions.

50. Instead of choosing a transport company that would have observed Meghan's civil rights and not assaulted her—or instead of transporting Meghan using Androscoggin County

personnel—the County Defendants, at Defendant Robinson's direction, choose the Transport Defendants because their services were cheap.

51. Had the County Defendants not contracted with the Transport Defendants for Meghan's—and other prisoners—transport, Meghan would not have been abused and tortured by the Transport Defendants.

52. Having hired a private company to transport prisoners, the County Defendants failed to supervise or monitor their operations and treatment of prisoners—including Meghan and countless other prisoners travelling to Androscoggin County. The County Defendants similarly failed to establish any sort of policy or procedure for the Transport Defendants to follow in transporting Androscoggin County prisoners, or train the Transport Defendants.

53. Because of the Transport Defendants' well-known and frequent violations of prisoners' constitutional rights and abuse of prisoners, the need for a policy or training was obvious.

54. In failing to take any action—first to vet the Transport Defendants prior to hiring, and later to train or supervise—the County Defendants expressed a deliberate indifference for Meghan and her constitutional rights.

55. The County Defendants still employ the Transport Defendants today, even after learning of their treatment of Meghan.

56. Because of the County Defendants' interstate prisoner transport policy willfully ignores all safety and civil rights concerns and because the County Defendants failed to supervise or train the Transport Defendants, the County Defendants caused Meghan to suffered significant harm.

57. WHEREFORE, Plaintiff Meghan Quinn respectfully requests that the Court enter Judgment against the Transport Defendants, John Doe Defendants, and the County Defendants on Count I and award her actual and punitive damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

## COUNT II – NEGLIGENCE

58. Plaintiff repeats and realleges every other paragraph in this Complaint.

59. On or about February 12, 2016, Meghan was a passenger a vehicle drive by the John Doe Defendants.

60. The John Doe Defendants owed Meghan a duty not to cause her needless harm.

61. The John Doe Defendants breached that duty when they negligently or recklessly caused Bailey physical and emotional harm. Breaches include:

   a. Failing to properly secure Meghan in the van;

   b. Failing to provide her with adequate heat, food, water, and medical care; and

   c. Failing to stop the prison van at reasonable times for bathroom breaks.

62. As a result of the John Doe Defendants conduct, Meghan suffered, and continues to suffer, significant harm, including severe emotional distress. Her injuries include a broken nose with significant complications, permanent scarring, post-traumatic stress disorder, depression, and anxiety.

63. WHEREFORE, Plaintiff Meghan Quinn respectfully requests that the Court enter Judgment against the John Doe Defendants on Count II and award her actual and punitive damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

## COUNT III – BATTERY

64. Plaintiff repeats and realleges every other paragraph in this Complaint.

65. The John Doe Defendants, without Meghan's permission, used the prison van they were operating to harmfully or offensively cause Meghan bodily harm.

66. John Doe Defendants intentionally or recklessly caused the harmful or offensive bodily contact.

67. As a result of the John Does' conduct, Meghan suffered and continues to suffer significant harm, including severe emotional distress.

68. WHEREFORE, Plaintiff Meghan Quinn respectfully requests that the Court enter Judgment against the John Doe Defendants on Count III and award her actual and punitive damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

69. Plaintiff restates and realleges every previous paragraph.

70. In threatening to harm, causing harm to, and causing others to harm, Meghan, Defendants intentionally or recklessly caused Meghan severe emotional distress.

71. Their conduct was extreme, outrageous, and exceeded all possible bounds of decency.

72. As a result of the John Doe Defendants' conduct, Meghan has suffered, and continues to suffer, severe emotional distress that no reasonable person should be expected to endure.

73. WHEREFORE, Plaintiff Meghan Quinn respectfully requests that the Court enter Judgment against the John Doe Defendants on Count IV and award her actual and punitive

damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

### COUNT IV – COMMON CARRIER STRICT LIABILITY

74. Plaintiff repeats and realleges every other paragraph in this Complaint.

75. The Transport Defendants contracted with Androscoggin County for Meghan Quinn's transport from Kissimmee, Florida to Auburn, Maine.

76. As transporters for hire, the Transport Defendants owe their passengers duty to avoid causing them unnecessary harm.

77. Transport Defendants owe their passangers a duty not to cause them needless harm.

78. The John Doe Defendants were employees or agents of the Transport Defendants and, at all relevant times, under their control. During the trip from Florida to Maine, the Transport Defendants controlled the John Doe Defendants' schedule, route, the frequency of their stops, and their conduct towards passengers, including Meghan.

79. The Transport Defendants breached their duties as common carriers in allowing the John Doe Defendants, their employees and agents, to harm Meghan while she was under their protection.

80. As a result of the Transport Defendants' breaches and failure to provide safe passage, Meghan suffered, and continues to suffer, serious harm.

81. WHEREFORE, Plaintiff Meghan Quinn respectfully requests that the Court enter Judgment against the Transport Defendants and award her actual and punitive damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

### COUNT V – VICARIOUS LIABILITY

82. Plaintiff repeats and realleges every other paragraph in this Complaint.

83. To perform its contract with Androscoggin County, the Transport Defendants employed the John Doe Defendants to transport Meghan from Kissimmee, Florida to Auburn, Maine.

84. The John Doe Defendants' wrongful acts occurred while they were operating a motor vehicle owned by the Transport Defendants and transporting Meghan at their direction. Transport Defendants' control over the John Doe Defendants includes:

   a. Controlling their drivers' schedules and routes;
   b. Facilitating communication between drivers and detention facilities where the Transport Defendants' prison vans stop, or transfer prisoners;
   c. Directly instructing drivers to pick up patients and certain times and locations;
   d. Providing drivers with prisoners' personal information;
   e. Supervising drivers directly;
   f. Controlling what prisoners can eat, when the van can stop for bathroom breaks, whether the prisoners are allowed blankets, whether prisoners are required to use Ziploc bags as toilets.

85. The John Doe Defendants' were under the Transport Defendants' employ for the entire trip from Kissimmee, Florida to Auburn, Maine. The John Doe Defendants' wrongful acts occurred during this time.

86. The John Doe Defendants' wrongful acts were performed at the Transport Defendants direction to increase profits.

87. Meghan's injuries were not unexpectable by the Transport Defendants who are acutely aware their drivers' conduct and the conditions in their prison vans.

88. WHEREFORE, Plaintiff Meghan Quinn respectfully requests that the Court enter Judgment against Defendants Prison Transport Systems of America and U.S. Prison Transport on Count VI and award her actual and punitive damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

## COUNT VII – NEGLIGENT SUPERVISION AND HIRING

89. Plaintiff repeats and realleges every other paragraph in this Complaint.

90. The Transport Defendants had a duty to prevent their employees from causing prisoners patients harm during transport.

91. The County Defendants had a duty not to hire a prison transport company that the they knew would cause Androscoggin County prisoners harm.

92. The Transport Defendants knew, or should have known, that their drivers were transporting prisoners in a manner that was certain to cause significant harm.

93. The County Defendants knew, or should have knew, that the Transport Defendants would harm Meghan and other inter-state transportees.

94. Upon information and belief, the Transport Defendants failed to conduct a proper background check

95. The County Defendants failed to adequately investigate the Transport Defendants prior to their hire.

96. The Transport Defendants, similarly, failed to supervise adequately, train, or monitor the drivers.

97. As a result of the County Defendants' and Transport Defendants' negligence, Meghan has suffered, and continues to suffer, significant harm.

98.     WHEREFORE, Plaintiff Meghan Quinn respectfully requests that the Court enter Judgment against Defendants Prison Transport Systems of America and U.S. Prison Transport on Count VII and award her actual and punitive damages in an amount to be proven at trial, costs, interest, attorney fees, and any other relief the Court deems just and equitable.

**DATED** at Portland, Maine on April 4, 2018.

Respectfully Submitted,

/s/ Benjamin N. Donahue
Thomas F. Hallett, Esq., Bar No. 3142
Benjamin N. Donahue, Esq., Bar No. 5303
Attorney for Plaintiff
HALLETT, ZERILLO & WHIPPLE, P.A.
6 City Center, Ste. 208
P.O. Box 7508
Portland, Maine 04112-7508
(207) 775-4255 Voice