UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MEGHAN NICOLE QUINN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 2:18-cv-00149-DBH |
| | ) | |
| US PRISONER TRANSPORT INC., | ) | |
| et al. | ) | |
| | ) | |
| Defendants | ) | |

**ORDER ON MOTION FOR LEAVE TO AMEND COMPLAINT AND
RECOMMENDED DECISION ON DEFENDANT'S MOTION TO DISMISS**

In this action, Plaintiff alleges two employees of a prison transportation contractor deprived her of certain constitutional rights during her extradition from Florida to Maine. (Complaint ¶ 1, ECF No. 1). Plaintiff also alleges Defendants Androscoggin County its District Attorney are legally responsible for the constitutional deprivation.

The matter is before the Court on Defendant Robinson's Motion to Dismiss, (Motion to Dismiss, ECF No. 21), and Plaintiff's Motion to Amend the Complaint. (Motion for Leave to Amend, ECF No. 28.)

Following a review of the relevant pleadings and after consideration of the parties' arguments, I grant Plaintiff leave to amend the complaint and recommend the Court deny the motion to dismiss.

## PROCEDURAL BACKGROUND

In response to Plaintiff's complaint (ECF No. 1), the Prisoner Transport Defendants filed (Transport Defendants) an answer. (ECF No. 20.) Defendant Robinson,[1] the District Attorney for Androscoggin County, filed a motion to dismiss. (Motion to Dismiss, ECF No. 21.)

On August 13, 2018, Plaintiff moved for leave to amend her original complaint, seeking to modify the named defendants and add a number of allegations. (Motion for Leave to Amend, ECF No. 28.) Citing the futility of the proposed new allegations, Defendant opposes in part the motion. (Objection in Part to Motion for Leave to Amend Complaint, ECF No. 31.)

## FACTUAL BACKGROUND[2]

### A.      The Extradition to Maine

In November 2016, law enforcement in Osceola County, Florida, arrested Plaintiff on a warrant issued by Defendant Robinson. (Proposed Amended Complaint ¶ 13.) The Osceola County Florida Sheriff's Department detained Plaintiff for sixteen days pending extradition to Maine. (*Id.* ¶ 14.)

In late November 2016, two John Doe Defendants arrived in a modified fifteen-passenger van to take custody of Plaintiff and transport her to Auburn, Maine. (*Id.* ¶ 15.)

---

[1] For purposes of addressing the two motions, Defendant Andrew Robinson will hereinafter be referred to as Defendant Robinson or Defendant. Defendant Robinson and Defendant Androscoggin County are collectively referred to as the County Defendants.

[2] Because I will grant Plaintiff leave to amend her complaint, *see infra* Discussion Part A, the following facts are drawn from Plaintiff's proposed amended complaint, which facts are accepted as true for purposes of evaluating the pending motion to dismiss. *See McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017).

According to Plaintiff, the John Doe Defendants secured the ankle bracelets on Plaintiff such that they cut through the skin, causing infection and permanent scarring. (*Id.* ¶ 40.) The John Doe Defendants also forced Plaintiff into a metal compartment, in which she could not stand up, lie down, or sit upright. Plaintiff was the only woman in the transport van. Her compartment was located near the front of the van, and she was separated from the male passengers by two small windows. She could hear and see them, and they could see her. (*Id.* ¶ 17.)

Over the course of five days, the van traveled approximately 1,500 miles from Kissimmee, Florida to Auburn, Maine. (*Id.* ¶ 18.) The van's prisoner compartment lacked heat and insulation. As they traveled north, the temperature dropped and Plaintiff's compartment became extremely cold. Plaintiff asserts she became hypothermic and began violently shaking. (*Id.* ¶ 19.)

By the second day, the van had yet to stop for a bathroom break for the passengers. Plaintiff asked the guards to stop so that she could use a bathroom. Rather than stop, a guard gave her a plastic bag to use. While still shackled, she attempted to use the bag. As she did, the male passengers could see her and made inappropriate and offensive comments. A similar scenario occurred daily. In addition, she was deprived of ability to maintain basic hygiene. Her clothes were soiled with urine and blood.

At one point, when Plaintiff begged the van's drivers for help, the drivers slammed on the brakes while traveling at highway speed. As the van was not equipped with seat belts, Plaintiff flew forward into the front of her compartment and broke her nose. *Id.* The

impact also caused her to flip upside down in her compartment.  The guards only returned her to an upright position when the van stopped three hours later.  (*Id.* ¶ 25.)

Despite her repeated requests for assistance, Plaintiff was required to continue to wear the same soiled clothes until the van neared Maine.  At that point, she was finally provided a clean pair of pants. (*Id.* ¶ ¶ 26 – 29.)  When she arrived at the Androscoggin County Jail, her broken nose remained untreated and she had developed an infection in the wounds caused by the shackles around her ankles. (*Id.* ¶¶ 30, 31.)

**B.     The Transportation Defendants' Policies and Knowledge**

According to Plaintiff, the Transport Defendants routinely create inhumane conditions for inmates they transport because their training is inadequate and their policies encourage the mistreatment of prisoners.  (*Id.* ¶ 41.)  The Transport Defendants require their drivers to travel extremely long distances at high speeds without stopping.  Further, they only contract with a relatively small number of jails along a given route for overnight stays or bathroom breaks.  Plaintiff contends that traveling for entire days without stopping is a standard operating protocol for the Transport Defendants' drivers.  (*Id.* ¶ 42.)  To facilitate the minimal-stop transports, Transport Defendants' policy requires their drivers to carry plastic bags that they force prisoners to use instead of an actual bathroom facility. The full bags remain in the van until the next stop. (*Id.* ¶ 43.)

Plaintiff alleges the lack of food, water, medical care, and the failure to accommodate basic human needs are also the result of the Transport Defendants' policies. When Plaintiff pleaded for a blanket, the drivers told her that the Transport Defendants had a policy of not providing any.  When a driver called the Transport Defendants for authority

to purchase a pair of pants for Plaintiff because her pants were soiled, the Transport Defendants would not authorize the purchase. (*Id.* ¶ 46.) At least thirty other prisoners have filed suit against the Transportation Defendants alleging similarly inhumane conditions. (*Id.* ¶ 47.)

## C.    The County Defendants' Policies and Knowledge

The County Defendants' interstate prisoner transport policy provides that extradited detainees are to be transported by the Transport Defendants and not Androscoggin County personnel.[3] Androscoggin County contracted with the Transport Defendants for transport services. (*Id.* ¶ 48.) Plaintiff alleges that before they arranged for the Transport Defendants to extradite Plaintiff from Florida to Maine, Androscoggin County and Defendant Robinson knew, or should have known, of the Transport Defendants' constitutionally deficient practices and policies. (*Id.* ¶ 50.) In support of that contention, Plaintiff asserts that soon after Plaintiff exited the Transport Defendants' van, an Androscoggin County employee observed Plaintiff's soiled clothes and injuries to her ankle and stated that "he had seen worse" come out of one of the Transport Defendants' vans. (*Id.* ¶ 53.)

Plaintiff alleges that after the County Defendants arranged for the Transport Defendants' services, the County Defendants failed to take any steps to ensure the safety of Androscoggin prisoners—despite receiving numerous reports of prisoner abuse. (*Id.* ¶ 51.) The complaints were made to Androscoggin County employees, including an Androscoggin County Jail supervisor. (*Id.* ¶ 52.) While Plaintiff was incarcerated, a high-

---

[3] In the Amended Complaint, Plaintiff refers to Defendant Androscoggin County and Defendant Robinson as the County Defendants. (Amended Complaint at 2, n. 2.)

level jail official apologized for the Transport Defendants' treatment. (*Id*. ¶ 54.) The jail official told her that he and other jail employees had seen other prisoners treated in a similar manner and had heard "horror stories" from other prisoners regarding the conditions in the Transport Defendants' vans like the treatment of Plaintiff. (*Id*.)

Plaintiff asserts that had the County Defendants conducted minimal due diligence, they would have learned of the Transport Defendants' practices. According to Plaintiff, a simple internet search, for example, reveals media reports regarding prisoners' deaths and alleged assaults against prisoners in Transport Defendants' custody; a report by the Marshall Project, an organization that covers issues related to the criminal justice system, documents egregious constitutional violations in the transport of prisoners; and an investigation by former Attorney General Loretta Lynch revealed abuses. (*Id*. ¶ 55.) Plaintiff alleges that despite this knowledge, the County Defendants, at Defendant Robinson's direction, made the decision to hire the Transport Defendants to transport Plaintiff from Florida to Maine. (*Id*. ¶ 56.) Plaintiff further alleges the County Defendants failed to supervise, monitor, and train the Transport Defendants.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may seek dismissal of "a claim for relief in any pleading" if that party believes that the pleading fails "to state a claim upon which relief can be granted." In its assessment of the motion, a court must "assume the truth of all well-plead facts and give the plaintiff[] the benefit of all reasonable inferences therefrom." *Blanco v. Bath Iron Works Corp.*, 802 F. Supp. 2d 215, 221 (D. Me. 2011) (quoting *Genzyme Corp. v. Fed. Ins. Co.*, 622 F.3d 62, 68 (1st Cir. 2010)). To

overcome the motion, a plaintiff must establish that his allegations raise a plausible basis for a fact finder to conclude that the defendant is legally responsible for the claim at issue. *Id.*

<h2 align="center">DISCUSSION</h2>

**A.     Plaintiff's Motion to Amend the Complaint**

Rule 15(a)(1) of the Federal Rules of Civil Procedure permits a litigant to amend a pleading "once as a matter of course," subject to certain time constraints.  However, when a party seeks to amend a complaint more than 21 days after the filing of a responsive pleading, the other party's consent or leave of court is required in order to amend the complaint.  Fed. R. Civ. P. 15(a)(2).  In such a case, the court is to grant leave to amend "freely" when "justice so requires." *Id.*; *see also Foman v. Davis,* 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'").

Defendant Robinson opposes Plaintiff's motion to amend the complaint on futility grounds.  When a plaintiff files a motion to amend in response to a motion to dismiss, the Court may deny the motion to amend, in whole or in part, if the proposed amendment would be futile.  *See Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996). A "futile" amendment is one that "would fail to state a claim upon which relief could be granted." *Id.*  In other words, "if the proposed amendment would be futile because, as thus

amended, the complaint still fails to state a claim, the district court acts within its discretion in denying the motion to amend." *Boston & Me. Corp. v. Hampton,* 987 F.2d 855, 868 (1st Cir. 1993).

Through his motion to dismiss, Defendant alleges Plaintiff has not alleged sufficient facts to support an actionable claim. Many of the specific allegations in the amended complaint inform the plausibility of Plaintiff's claim against Defendant. For instance, the alleged comments of several Androscoggin County employees citing multiple instances of mistreatment against other County prisoners supports Plaintiff's claim that the Transport Defendants have a history of violations. The assessment of the motion to dismiss and Defendant's futility argument as to the motion to amend involve the same analysis – whether in her amended complaint, Plaintiff has asserted an actionable claim. *See Glassman*, 90 F.3d at 623 ("There is no practical difference, in terms of review, between a denial of a motion to amend based on futility and the grant of a motion to dismiss for failure to state a claim"). As explained below, assuming the truth of Plaintiff's factual assertions and giving Plaintiff the benefit of all reasonable inferences from the alleged facts, *Blanco*, 802 F. Supp. 2d at 221, in her amended complaint, Plaintiff asserts an actionable claim.[4]

## B.     Sufficiency of Deliberate Indifference Claim

Pursuant to the federal civil rights statute:

---

[4] Even if I did not conclude that Plaintiff's proposed amended complaint asserts an actionable claim, it is appropriate to assess Plaintiff's amended allegations where Plaintiff sought leave to amend early in the litigation, there is no prejudice to Defendant, and where the proposed amendments enhance the plausibility of Plaintiff's claim. *See Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980) ("Unless a proposed amendment may clearly be seen to be futile because of substantive or procedural considerations, conjecture about the merits of the litigation should not enter into the decision whether to allow amendment").

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To maintain a claim under section 1983, a plaintiff must establish: "1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 45 (1st Cir. 1999). For purposes of the motion to dismiss, Defendant Robinson does not dispute that the Transport Defendants acted under color of state law or that the Transport Defendants' conduct violated Plaintiff's rights to be free from cruel and unusual punishment, use of excessive force, and punishment without due process. Defendant Robinson maintains that under the applicably law, he is not legally responsible for any constitutional violations resulting from the Transport Defendants' conduct.

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* "This does not mean, however, that for section 1983 liability to attach, a supervisor must directly engage in a subordinate's

unconstitutional behavior." *Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016). "[L]iability may attach 'if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (quoting *Camilo–Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir.1999)); *see also Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008) (liability for "supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference" toward unconstitutional conduct of others).

To succeed on a theory of deliberate indifference, a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) the defendant's failure to take easily available measures to address the risk. *Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 279 (1st Cir. 2000). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410–11 (1997). In addition to showing deliberate indifference, "[c]ausation remains an essential element," which "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." *Guadalupe-Baez*, 819 F.3d at 515. "That is a difficult standard to meet but far from an impossible one. . ." *Id.* Isolated instances of unconstitutional activity ordinarily will not suffice, but "a plaintiff may, for example, prove causation by showing inaction in the face of a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'" *Id.* (quoting *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 582 (1st Cir.1994).

1.     **Available Measure to Address the Risk from Contractors, Rather than Employees**

Defendant attempts to distinguish much of the § 1983 hiring, training, and supervisory authority because the relevant cases did not involve the use of private contractors as in this case.  Because this argument not only implicates the third element of the deliberate indifference test—whether Defendant failed to take easily available measures to address the risk—but also informs some of the analysis of the other elements, I address the third element first.

Persuasive authority rejects the notion that public decisionmakers are absolved of their obligation to remedy known or obvious risks of constitutional abuses by reassigning tasks from public employees to private contractors.  In *West v. Atkins*, 487 U.S. 42 (1988), for example, the Supreme Court explained that the constitution requires a functional approach whenever government acts through private contractors:

> The fact that the State employed respondent pursuant to a contractual arrangement . . . does not alter the analysis.  It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. . . . Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."

*Id.* 55 – 56.  The Court noted that "if this were the basis for delimiting § 1983 liability, the state will be free to contract out all services which it is constitutionally obligated to provide and leave its citizens with no means for vindication of those rights, whose protection has been delegated to 'private' actors, when they have been denied."  *Id.* n.14. (internal quotation marks omitted).

Other courts have applied the same hiring, training, and supervisory framework to public actors who use the services of private contractors, rather than public employees. *See Cato v. City of San Diego*, 945 F.2d 408, 1991 WL 190119 (9th Cir. 1991) (memorandum disposition) (applying standard municipal liability framework to independent contractor); *Talley v. Trautman*, No. CIV. A. 96-5190, 1997 WL 135705, at *4 (E.D. Pa. Mar. 13, 1997) (same; "the borough may not escape its constitutionally imposed duties to supervise and train its law-enforcement agents simply by varying the nature of its employment relationship with those agents"). As the Third Circuit explained:

> [T]his argument hinges entirely on the outsourcing of prison medical care to a private, third-party provider. Appellants do not argue that they have no responsibility to supervise state-employed correctional staff such as guards, or that they would have no responsibility to supervise the medical staff were it composed of state employees rather than private contractors. Rather, their argument depends entirely on the Court finding that there is a difference of constitutional import between the two. No reasonable prison administrator could believe that hiring a private contractor to provide a constitutionally required service would allow them to abdicate their constitutional supervisory duties. Yet, culled to its essence, that is Appellants' argument.

*Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 326–27 (3d Cir. 2014), *reversed on other grounds, Taylor v. Barkes*, 135 S. Ct. 2042 (2015).

Consistent with this approach, courts have not defined the deliberate indifference oversight responsibility solely in terms of an employer-employee relationship. *See e.g.*, *Iqbal*, 556 U.S. at 677 ("masters" and "servants"); *Bryan Cty.*, 520 U.S. at 410–11 (indicating that deliberate indifference can manifest in any "action" or "approach" from a public "actor"); *See e.g., Guadalupe-Baez*, 819 F.3d at 514 (referring to "supervisor" and "subordinate," not "employees"); *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998)

("as where A is not a direct actor (i.e., he himself did not perpetrate the seizure, detention, or assault of which V complains), but, rather, stands accused of permitting a third person ("B"), also a state actor, to violate V's rights. . ."); *Maldonado-Denis*, 23 F.3d at 582 (referring to a public official's "conduct," "behavior," and "what he does (or fails to do)").

Although the lack of an employer-employee relationship between the County Defendants and the Transport Defendants does not preclude Plaintiff from asserting a deliberate indifference claim against the County Defendants, the actual relationship does not necessarily implicate Defendant Robinson. An issue is whether in his role as District Attorney, Defendant Robinson had an easily available measure to avoid or minimize the risk. As to Plaintiff's failure to train allegation, Defendant could not reasonably have had direct access to the individuals to provide training. In other words, training the Transport Defendants was not a measure that was easily available to Defendant. Plaintiff, therefore, cannot sustain an independent deliberate indifference claim against Defendant based on the alleged lack of training.

Defendant's alleged involvement in the decision to retain the services of the Transport Defendants, however, could arguably support a deliberate indifference claim. As alleged, the County Defendants were on notice that the Transport Defendants' policies placed inmates at risk, yet the County Defendants took no measures to address the risk. Based on Plaintiff's allegations, certain employees of Androscoggin County had direct knowledge of the abuse to which prisoners were subjected by the Transport Defendants. If Defendant Robinson was aware of the abuse, or the risk of abuse was so obvious that he should have been aware of the risk of abuse, Defendant had easily available measures,

including the termination of the agreement with the Transport Defendants and the use of other means of transport, to avoid the risk.

Significantly, Plaintiff does not simply allege that in some general way Defendant Robinson directed other county employees to contract with the Transport Defendants. Instead, Plaintiff alleges Defendant Robinson "procure[d]" the contract with the Transport Defendants. (Amended Complaint ¶ 49). Plaintiff also asserts that after contracting with the Transport Defendants, the County Defendants (which include Defendant Robinson) failed to take measures to provide for the safety of the prisoners despite receiving numerous complaints of prisoner abuse. (*Id.* ¶ 52.)

Although Defendant Robinson contends he is not responsible for Androscoggin County's policies or the implementation of the policies as he is an employee of the state of Maine, not Androscoggin County, given Plaintiff's allegations, and given that the allegations are not inconsistent with a prosecutor's role in the extradition process under Maine law, a factfinder could plausibly infer that Defendant was involved in an administrative capacity in transport decisions. *See* 15 M.R.S. § 224(1) ("When a fugitive from justice is returned to the State of Maine for prosecution, expenses incurred that are necessary and proper for the return must be paid out of the funds allotted for that purpose to the district attorney or from the Extradition and Prosecution Expenses Account"); *id.* § 224(5) ("The prosecuting attorney"—defined as the District Attorney or the Attorney General in cases he or she prosecutes—"shall, in all cases, designate appropriate agents to safely return the prisoner to the State of Maine"). Accordingly, Plaintiff's allegations of Plaintiff's involvement in the hiring and retention of the Transport Defendants plausibly

support a finding that Defendant Robinson had available to him reasonable measures (e.g., terminate the contract, arrange for alternative transportation services) to address the risk.

### 2. Risk of Constitutional Violation

For purposes of the motion to dismiss, Defendant Robinson does not argue that Plaintiff's treatment failed to rise to the level of cruel and unusual punishment, use of excessive force, or punishment without due process. Rather, Defendant argues that as to his decisions, the risk that such violations would occur was not sufficiently grave. Defendant's argument is unpersuasive.

Plaintiff has alleged facts about the Transport Defendants' practices and the Transport Defendants' performance, which, if proven, would demonstrate a significant risk of constitutional violations in the transport of Plaintiff to Maine. The pertinent allegations include:

- As a result of corporate decisions to contract with a small number of jails along a given route for bathroom stops and overnight stays, the "standard operating protocol for the Transport Defendants' drivers" is to travel "for entire days without stopping," (Proposed Amended Complaint ¶ 42), which makes it plausible to infer an increased risk that some prisoners will be subjected to unacceptable conditions.

- The Transport Defendants' policy requires their drivers to carry plastic bags for prisoners to use, rather than providing mobile bathroom facilities or stopping more frequently, (*id.* ¶ 43), which makes it plausible to infer an

elevated risk that some prisoners will be subjected to unsanitary and degrading conditions.

- The Transport Defendants' policies encourage drivers to drive further without stopping, to drive through the night, and divert from more direct routes for additional pick-ups to maximize the number of prisoners transported per trip (*id.* ¶ 44), which one would expect to extend the duration of some prisoners' custody, which makes it plausible to infer that this would unnecessarily multiply the risks to which prisoners are subjected during any amount of time in transit.

- The Transport Defendants' policies against providing blankets or adequate heat in their vans, even during winter in cold climates, or providing a change of clothes when soiled with human waste, (*id.* ¶ 46), makes it more likely that some prisoners will be subjected not only to undue discomfort, but also health-related conditions such as hypothermia and infection.

In addition, according to Plaintiff, media reports of very similar incidents involving the Transport Defendants, including a report by the Marshall Project, (*id.* ¶ 55), were easily available and create reason to infer that Plaintiff's treatment was not an isolated incident, but was emblematic of a widespread risk posed by the Transport Defendants' conduct. That inference is made more plausible by the fact that former Attorney General Loretta Lynch initiated an investigation into similar incidents involving the Transport Defendants. *Id.* The allegation of the numerous lawsuits in other jurisdictions against the Transport Defendants alleging similar treatment of prisoners—at least thirty since 2006, (*id.* ¶ 47)—

also supports the plausibility of a grave risk of constitutional violations. The alleged comments of two employees of Androscoggin County—one that other jail employees had seen other prisoners treated similarly, and another that the employee had personally seen prisoners come out of the Transport Defendants' vans in a worse condition than Plaintiff, (*id.* ¶ 52-54)—further support the inference that entrusting prisoners to the Transport Defendants without additional policies or contractual conditions and oversight presented a grave risk to prisoners' constitutional rights.

The caselaw upon which Defendant Robinson relies to support his argument, including caselaw in this District, is distinguishable. The plaintiff in *Parker v. Dall-Leighton*, No. 2:17-CV-216-GZS, 2017 WL 6210892, at *1-2 (D. Me. Dec. 8, 2017) alleged that she was sexually abused by a corrections officer and brought suit against prison supervisors and the commissioner of the Maine Department of Corrections, among others. The Court (Singal, J.) dismissed the claims against the supervisory officials because the only prior indication that the perpetrator presented a risk of sexual abuse was "an investigation of another corrections officer who was best friends with [the perpetrator], as well as their knowledge that [the perpetrator] was suspended during that investigation." *Id.* at *6. Defendant contends that as in *Parker*, a report such as the Marshall Project or the fact of a Department of Justice investigation is insufficient.

Plaintiff alleges knowledge of much more than was alleged in *Parker*. Here, Plaintiff has alleged that prior to the transport of Plaintiff from Florida to Maine, Defendant Robinson, who was allegedly involved in the decision to contract with the Transport Defendants, was aware or he obviously should have been aware of many complaints of

17

prisoner abuse by the Transport Defendants, which complaints includes situations involving prisoners transported to Androscoggin County. In short, the factual allegations are sufficient to push the risk issue "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).

### 3. Knowledge of the Risk and Causation

As referenced above, Plaintiff has alleged that Defendant was aware that the Transport Defendants subjected prisoners to similar conditions before Plaintiff was transported, but he took no measures to provide for Plaintiff's safety. While a general allegation of knowledge, without more, against an elected supervisory official is ordinarily too generalized or conclusory to state a plausible claim on its own, *see Iqbal*, 556 U.S. at 678, Plaintiff has alleged a number of more specific facts that Plaintiff maintains could lead a rational fact finder to conclude that based on the Transport Defendants' past performance, Defendant knew of the risk and deliberately ignored it, or in the alternative, that by entrusting prisoners to a private contractor without sufficient policies, terms, and contractual oversight, Defendant was deliberately indifferent to a genuine risk of a constitutional deprivation.

A pattern of similar violations by subordinates, rather than an isolated instance, is typically required to establish notice and causation because "the existence of a pattern of tortious conduct" by subordinates "may tend to show that" the superior's policies in screening, hiring, training, or supervision, "rather than a one-time negligent administration of the program or factors peculiar to the [subordinate] involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Bryan Cnty.*, 520 U.S. at 407 – 408

(holding that solitary failure of sheriff to follow pre-hire employee screening procedure did not support the inference of deliberate indifference that is required to support a municipal liability claim). As the Court noted in *Bryan County*, the "continued adherence to an approach that [policy-making officials] know or should know has failed to prevent tortious conduct by [subordinates] may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger . . . liability."[5] *Id.* at 407. Without the pattern, ordinarily, the inference of culpability greater than negligence is strained.

In this case, Plaintiff has alleged specific facts to support her contention that Defendant Robinson knew of the risk of constitutional violations or was willfully ignorant of the pattern. First, a number of relevant news articles, a report by the Marshall Project, and an investigation by former Attorney General Loretta Lynch were all allegedly readily available if Defendant Robinson conducted reasonable due diligence on the Transport

---

[5] In addition to the parties' dispute regarding the relevance of the hiring, training, and supervising caselaw discussed herein, the parties also dispute the relevance of cases like *Bryan County*, which involved questions of municipal liability rather than supervisory liability. Because municipal liability is based on the decisions of policymakers, there is a connection between municipal liability and liability of policymakers. The cases, therefore, are instructive. *See Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011) ("Beyond his own conduct, the extent of his liability as a supervisor is similar to that of a municipality that implements an unconstitutional policy"). Despite the common use of different labels, the Supreme Court appears to apply a common inquiry based on "fault and causation" in all of the cases. *See Bryan Cty.*, 520 U.S. at 407. The common framework applied to all cases involving "tortious conduct by employees" and the "action[s]" of entities in a superior position suggest that the cases are not separate and distinct categories of liability, but rather are all instances of the same deliberate indifference inquiry applied to different fact patterns. *See e.g., id.* ("Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability"). The *Iqbal* Court's clarification that "the term 'supervisory liability' is a misnomer" because the relevant inquiry is into each entity's "own misconduct," supports the conclusion that all of the cases, including municipal liability cases, may be helpful in illuminating the burden plaintiffs bear in making out a case based on a theory of deliberate indifference to constitutional harms from the actions of others. *See Iqbal*, 556 U.S. at 677.

Defendants, when the County Defendants were assessing whether to use the Transport Defendants, law enforcement officers or different private companies for prisoner transportation. (*Id.* ¶ 55.) Second, the significant number of lawsuits against the Transport Defendants alleging similar treatment to that which Plaintiff allegedly endured would also have been revealed through a reasonable investigation. (*Id.* ¶ 47.) Third, according to Plaintiff, other Maine counties decided not to contract with the Transport Defendants specifically because of the Transport Defendants mistreatment of prisoners. (*Id.* ¶ 57.) Fourth, Plaintiff recounts that multiple Androscoggin County employees asserted that they witnessed serious mistreatment on prior occasions or knew of previous reports involving the Transport Defendants' abuse of Androscoggin county prisoners. (*Id.* ¶¶ 52-54.)

As discussed above, Defendant argues that the allegations regarding complaints to Androscoggin County employees should not contribute to an inference that he had knowledge of prior incidents and complaints because he is a state employee, not an employee of the county. While district attorneys are state employees, the fact that Defendant and the jail employees might have different employers is not controlling. Maine counties provide the funds for district attorneys and their staff, including operational expenses and office space, and as local prosecutors, district attorneys often work closely with county law enforcement employees. *See* 30-A M.R.S. § 281 (identifying county resources available to district attorneys). In addition, as referenced above, under Maine law, the prosecuting attorney is directly involved in the transportation of fugitives and, in fact, is responsible for the safe transport of the prisoners. *See* 15 M.R.S. § 224(5). Whether one can reasonably infer that Defendant Robinson was aware of the information known to

jail employees is ultimately a factual issue to be developed as the case progresses. "Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of their official responsibilities the municipal policymakers should have known of them." *Bordanaro v. McLeod*, 871 F.2d 1151, 1157 (1st Cir. 1989) (internal quotation marks and modifications omitted). At this stage of the proceedings, given the relationship between Androscoggin County and Defendant Robinson, Plaintiff's allegations regarding the comments of multiple county officials about multiple prior incidents make it plausible to infer that Defendant Robinson knew of the prior incidents or was "willfully blind" to them. *See Morales v. Chadbourne*, 793 F.3d 208, 222 (1st Cir. 2015) (relying on comments from subordinate government employees indicating a pattern of violations); *Maldonado-Denis*, 23 F.3d at 582.

Given Plaintiff's allegations, Defendant's reliance on the First Circuit's decision in *Guadalupe-Baez v. Pesquera*, 819 F.3d 509, to support his contention that the evidence is insufficient is unavailing. In *Guadalupe-Baez*, the plaintiff was shot by an unknown police officer and, unable to ascertain the identity of the shooter, filed suit against the head of the Puerto Rico Police Department, among others. In support of his claim of notice, the plaintiff relied on information included in a Department of Justice report. The First Circuit reversed the district court's dismissal of the claim against the police chief, reasoning that the report alone was sufficient to plausibly infer that the police chief knew of a grave risk, "though not by much." *Id.* at 517-18. To the extent Defendant Robinson contends that dismissal is warranted because in this case Plaintiff cannot cite a similar report, Defendant's argument is unconvincing. While the alleged DOJ investigation, Marshall

Project findings, and media reports might, by themselves, be insufficient, as explained above, Plaintiff has alleged sufficient additional facts to support the plausible inference that Defendant Robinson was aware or obviously should have been aware of prior similar incidents involving the Transport Defendants. *Guadalupe-Baez*, therefore, does not require dismissal of Plaintiff's case at this stage of the proceedings.

Defendant's reliance on this Court's decision in *Edson v. Riverview Psychiatric Ctr.*, No. 1:16-CV-00079-JAW, 2017 WL 780787, at *1 (D. Me. Feb. 28, 2017), is similarly misplaced. In *Edson*, the plaintiff was allegedly abused by corrections officers at a Psychiatric Center and brought suit against the Commissioner of the Maine Department of Health and Human Services, among others. This Court (Woodcock, J.) dismissed the claim because the documents and reports that allegedly placed the Commissioner on notice of a significant risk of harm actually warned of different risks, not the specific type of risk of the abuse to which plaintiff was subjected. *See e.g. id.* at *12 ("However, a review of the CMS Report confirms that its reference to 'law enforcement personnel' was not to COs, but to the 'Kennebec Sheriff Officers (KSO)'"). In contrast, in this case, the risk of the constitutional violations that could reasonably be inferred from the information available to Defendant Robinson involved the same or similar conduct by the Transport Defendants. Plaintiff has alleged sufficient facts from which one could reasonably infer that Defendant was aware of the risk to Androscoggin County prisoners if the Transport Defendants' were selected and retained without additional contractual conditions, policies, or supervision, and that "continued adherence to an approach that [he] [knew] ha[d] failed to prevent tortious conduct by [his chosen contractor] may establish the conscious disregard for the

consequences of [his] action—the 'deliberate indifference'—necessary to trigger . . .

liability." *Bryan Cnty.*, 520 U.S. at 407. The Court's decision in *Edson* thus does not

support dismissal in this case.[6]

## B.     Absolute Immunity

Defendant Robinson contends dismissal is appropriate because he has absolute

immunity from liability.

"Despite the broad terms of § 1983, [The Supreme Court] has long recognized that

the statute was not meant to effect a radical departure from ordinary tort law and the

common-law immunities applicable in tort suits." *Rehberg v. Paulk*, 566 U.S. 356, 361

(2012). Absolute immunity applies to a narrow swath of public officials, including judges

performing judicial acts within their jurisdiction, prosecutors performing acts intimately

associated with the judicial phase of the criminal process, and agency officials with

---

[6] Even if one could not plausibly infer from Plaintiff's complaint that Defendant Robinson was aware of
the prior incidents at the time the Transport Defendants were retained to transport prisoners for
Androscoggin County, Plaintiff has arguably asserted sufficient facts to sustain a claim at this stage of the
proceedings. When Defendant's alleged actions are analyzed under the standard for a hiring decision as
articulated in *Bryan County*, Plaintiff's allegations are sufficient. "To prevent . . . liability for a hiring
decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the
policymaker's inadequate decision and the particular injury alleged," because "[e]very injury suffered at
the hands of a municipal employee can be traced to a hiring decision in a "but-for" sense . . . ." *Bryan Cty.,*
520 U.S. at 410. "Only where adequate scrutiny of an applicant's background would lead a reasonable
policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would
be the deprivation of a third party's federally protected right can the official's failure to adequately
scrutinize the applicant's background constitute "deliberate indifference." *Id.* at 411. The plaintiff's claim
in *Bryan County* failed because there was an inadequate showing that proper screening measures would
have revealed a sufficiently obvious risk that the applicant, if hired, would inflict the "*particular*"
constitutional injury that the plaintiff suffered. *Id.* at 412. In this case, even if Defendant Robinson did not
have actual or constructive knowledge of the Transport Defendants' prior mistreatment of prisoners within
Androscoggin County or the reports of prior mistreatment in other jurisdictions, Plaintiff has plausibly
alleged that Defendant chose to hire a private contractor without investigating the contractor's background,
training, or policies, and that adequate or even minimal due diligence into such questions would have
revealed a pattern of deficiencies and remarkably similar prisoner mistreatment.

functions similar to judges and/or prosecutors. *Goldstein v. Galvin*, 719 F.3d 16, 24 (1st Cir. 2013) (internal quotation marks omitted). In determining whether any or a particular form of immunity applies, courts take "a functional approach, which looks to the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (internal citations and quotations omitted).

"Prosecutors are entitled to absolute immunity from liability under § 1983 to the extent that such immunity is 'necessary to protect the judicial process.'" *Filler v. Kellett*, 859 F.3d 148, 152–53 (1st Cir. 2017) (quoting *Burns v. Reed*, 500 U.S. 478, 485 (1991)). "However, a prosecutor does not receive absolute immunity when acting in the role of an administrator or investigative officer." *Id.* "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question" and "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns*, 500 U.S. at 486–87.

Other courts have held that a prosecutor's decision *whether* to extradite a defendant, like the decision whether to prosecute a defendant, is entitled to absolute immunity. *Slater v. Clarke*, 700 F.3d 1200, 1203 (9th Cir. 2012); *Lessard v. Cravitz*, 686 F. App'x 581, 588 (10th Cir. 2017). Plaintiff's claim, however, is not based on Defendant's decision to extradite Plaintiff. Instead, Plaintiff's claim is based on Defendant Robinson's administrative decisions regarding the physical transport of Plaintiff. (Amended Complaint ¶ 49.)

Decisions related to the conditions under which a prisoner is transported as part of the extradition process are not discretionary decisions within the scope of absolute

immunity afforded prosecutors. The distinction between prosecutorial responsibilities to which immunity applies and administrative tasks to which immunity does not apply was underscored in the Supreme Court's decision in *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), where the Court found absolute immunity covered claims against supervisory prosecutors for failure to train and supervise other prosecutors. *Id.* at 344. The *Van de Kamp* Court reasoned that "unlike administrative duties concerning, for example, workplace hiring, payroll administration, the maintenance of physical facilities, and the like," the claims at issue there "focus upon a certain kind of administrative obligation—a kind that itself is directly connected with the conduct of a trial." *Id. Van de Kamp* teaches that the nature of the underlying task informs the analysis of whether a superior's hiring, training or supervisory decisions are properly classified as administrative activities or prosecutorial activities.

The policy decisions regarding hiring or training of guards and policies governing prisoner transportation and handling are functions not intimately connected to the judicial phase. The functions are typically performed by police officers, corrections staff, or other executive branch policymakers that do not perform any role in trial advocacy. *See Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 30 (1st Cir. 1995) (rejecting absolute immunity based in part on the observation that "[t]hese are functions typically performed by police officers and detectives"). It would be "incongruous" if sheriffs were tasked with deciding how to carry out a prosecutor's decision to extradite a prisoner with only the protection of qualified immunity for their decisions concerning hiring and supervision of prisoner transportation efforts, but a prosecutor would receive the protection of absolute immunity

when performing those same functions. *See Burns v. Reed*, 500 U.S. 478, 495 (1991) ("Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. Ironically, it would mean that the police, who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not"). In this case, Plaintiff asserts a claim based on Defendant Robinson's alleged administrative decisions regarding the Transport Defendants. (Amended Complaint ¶ 49.) As the claim is alleged, therefore, Defendant is not entitled to absolute immunity.

**C.    Qualified Immunity**

Defendant Robinson also contends that qualified immunity applies and, therefore, Plaintiff's claim should be dismissed.

Government officers are entitled to qualified immunity unless they violate a constitutional right that was "clearly established" when they engaged in the conduct at issue. *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). "This strain of immunity aspires to 'balance [the] desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive.'" *Cox v. Hainey*,

391 F.3d 25, 29 (1st Cir. 2004) (quoting *Buenrostro v. Collazo,* 973 F.2d 39, 42 (1st Cir. 1992)).

When a court considers whether the constitutional right was clearly established at the time, the court must determine (a) "whether the contours of the right, in general, were sufficiently clear," and (b) "whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." *Ford v. Bender,* 768 F.3d 15, 23 (1st Cir. 2014). For purposes of the motion to dismiss, Defendant does not dispute that Plaintiff's treatment at the hands of the Transport Defendants violated clearly established law concerning cruel and unusual punishment, use of excessive force, or punishment without due process. Rather, he argues that the contours of his obligations in screening and supervising a private contractor, as opposed to public employees, were insufficiently clear for liability to attach.

It has been "well settled" for decades "that a deliberately indifferent . . . supervisor may be held liable" for constitutional violations caused by that official's decisions involving screening, training, and supervising subordinates. *See Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998). In this case, Defendant allegedly chose to use private contractors to transport Plaintiff, rather than public employees. Although there are few cases that directly address public officials' screening, training, and supervisory duties with respect to contractors, as opposed to employees, the lack of a specific case involving a public official's responsibility for a private contractor's alleged constitutional deprivations during the transport of prisoners is not dispositive of the qualified immunity issue. *Barton v. Clancy*, 632 F.3d 9, 21–22 (1st Cir. 2011) ("This does not mean that an official action is

protected by qualified immunity unless the very action in question has previously been held unlawful, but rather that in the light of pre-existing law the unlawfulness must be apparent") (internal quotation marks omitted); *Hall v. Ochs*, 817 F.2d 920, 925 (1st Cir. 1987) ("The fact that no court had put these pieces together in the precise manner we do today does not absolve defendants of liability").

At the time the Transport Defendants transported Plaintiff to Maine, the law was clearly established that Transport Defendants' alleged conduct was in violation of Plaintiff's constitutional protections. In fact, at this stage of the proceedings, Defendant does not challenge Plaintiff's assertion that the Transport Defendants' performance was constitutionally deficient. The central question as to Defendant Robinson is whether the law was clearly established that a governmental official, such as Defendant Robinson, alleged to be involved in the transport decision, is absolved of responsibility for assuring that during transport, the treatment of the prisoners satisfied basic constitutional requirements, by simply contracting with a third-party to transport the prisoners, without an assessment of and regardless of the quality of the services provided by the third-party. As the Third Circuit explained when faced with the same argument Defendant now presents:

> [T]his argument hinges entirely on the outsourcing of prison medical care to a private, third-party provider. Appellants do not argue that they have no responsibility to supervise state-employed correctional staff such as guards, or that they would have no responsibility to supervise the medical staff were it composed of state employees rather than private contractors. Rather, their argument depends entirely on the Court finding that there is a difference of constitutional import between the two. No reasonable prison administrator could believe that hiring a private contractor to provide a constitutionally

required service would allow them to abdicate their constitutional supervisory duties. Yet, culled to its essence, that is Appellants' argument.

*Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 326–27 (3d Cir. 2014), *reversed on other grounds, Taylor v. Barkes*, 135 S. Ct. 2042 (2015) (the Supreme Court disagreed with the Third Circuit that the underlying right which the subordinates violated was clearly established, but did not take issue with the conclusion that there are well-defined supervisory duties regarding constitutional violations by private contractors).

The Third Circuit's reasoning is sound and demonstrates that the law was clearly established at the time of Plaintiff's transport to Maine, a government official responsible for the safety and well-being of prisoners, cannot abdicate that responsibility by contracting with a third-party. Necessarily, therefore, if a government official is aware or obviously should have been aware that the third-party's practices present a genuine risk of a constitutional deprivation, but the official does not take readily available measures to mitigate the risk, the government official can be legally responsible for the deprivation. Plaintiff has alleged such facts in this case. Contrary to Defendant's argument, therefore, the relevant law was clearly established at the time Plaintiff was transported to Maine.

**D.      Plaintiff's State Law Tort Claims**

Defendant argues that Plaintiff's state law tort claims fail for the same reasons, because, under the Maine Tort Claims Act, 14 M.R.S. § 8101–8118, state employees enjoy immunity for actions that are arguably within their discretion, which Defendant argues is at least as broad as the deliberate indifference analysis under §1983. Because Plaintiff has plausibly alleged a claim under Section 1983, Defendant's argument fails even assuming

that his analysis of the scope of Maine law is correct.  Accordingly, dismissal of Plaintiff's state law tort claims is not warranted.

CONCLUSION

Based on the foregoing analysis, I grant Plaintiff's Motion for Leave to Amend the Complaint. (ECF No. 28.)  In addition, for the reasons explained above, I recommend the Court deny Defendant's Motion to Dismiss Plaintiff's complaint.  (ECF No. 21.)

**NOTICE**

Any objection to this Recommended Decision and Order shall be filed in accordance with Federal Rule of Civil Procedure 72.

With respect to the order on non-dispositive matters (i.e., order on motion to amend), a party may serve and file objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(a).

With respect to the recommendations made herein, a party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. Section 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum within fourteen (14) days of being served with a copy.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection. Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 17th day of January, 2019.